[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In this matter tried to the court, the plaintiff has alleged that the defendant was a participant in a fraudulent transfer of CT Page 9420 real estate, thus preventing the plaintiff from satisfying a debt. While the relationships of the various individuals are fairly complex, the underlying issues are quite straightforward.
The defendant Fries' step-grandmother, Barbara Hunter, is currently a resident of the plaintiff Connecticut Baptist Homes. Barbara Hunter's son, George Hunter, is the step-father of Damian Fries. George Hunter has also at relevant times been the attorney in fact, by virtue of a durable power of attorney for Barbara Hunter.
Barbara Hunter was admitted to the plaintiff's facility twice: the first time from February 15, 1994, to April 18, 1994, and the second time from January 12, 1995, to the present time. There is no plan, so far as the evidence showed, for discharge in the foreseeable future. The plaintiff has at least two rates corresponding to different levels of care, including custodial and skilled nursing care. The custodial rate was $45.00 per day; the skilled care rate was $156.60 per day. The first admission, in 1994, was at the level of skilled nursing care. Those services have been paid for and are not relevant to this case, except for historical purposes and for the fact that the durable power of attorney, witnessed by Damian Fries, was executed two days after Barbara was admitted.
Damian lived in Connecticut in 1994 and George lived in California. Damian noticed a deterioration in Barbara's condition and urged his step-father to return from California to assess the situation. George did return, and on January 12, 1995, Barbara was readmitted to the plaintiff's facility, this time in custodial care at $45.00 per day. George Hunter signed an agreement, as Barbara's attorney in fact, to pay for the care.
Barbara had lived in a house which, for a period of time prior to and during the events in issue, was owned jointly by her and George. While George was in Connecticut, the question arose of what to do with the house, as it seemed to have become apparent that it was unlikely that Barbara would have a need for it. Damian agreed to buy the house for the total amount of $50,000.00. On or about February 17, 1995, Damian received a quit claim deed for the house in return for two checks in the amount of $25,000.00 each: one was payable to George Hunter individually, and the other was payable to Barbara Hunter.
An appraiser testified on behalf on the plaintiff. The CT Page 9421 appraiser's conclusion was that the fair market value of the real estate at the time of the transaction was $92,000.00. He reached his conclusion by comparing the sale to other comparable sales. He neither looked at nor asked to look at the inside of the house; it apparently was a "drive-by" appraisal. He relied on Damian's discovery responses, including an answer Fries had supplied to the effect that the condition of the house was "average". He agreed that had the house been listed on the open market, that it may have taken six months to a year to be sold, that financing costs and required inspections could be impediments to a sale and that it is not unusual for older people living in a home to "defer maintenance" on the home.
Fries testified that the condition of the house was poor when he bought it and that he had answered "average" on the interrogatory form because that was its condition at the time he answered the interrogatory. He said that he is a general contractor and does rehabilitation work, among other things, and that he spent many hours working on the premises. He testified that a house of greater value on the same street recently sold for $77,000 on the market.
Payments were made for Barbara's care through October 8 or October 9, 1995. At that time, Barbara's condition required transfer to skilled care. George was reached by telephone and agreed to pay at the new rate of approximately $156 per day. Barbara apparently signed an agreement as well. No payment was received, however, except for a check from George in the amount of $15,106, which was sent in February, 1996, but which also was returned for insufficient funds. Medicaid is paying the bills at this time, but there is a gap for the period of time from October 9, 1995, to January 13, 1996, for which no one has paid, and there are also periods of time for which payment is due in February, March and April, 1996. The plaintiff has obtained judgments against Barbara and George Hunter in the amount of $25,493.19, but apparently has received no money from either source.
The plaintiff had no agreement with Damian Fries, the defendant, regarding payment for services rendered to his step-grandmother.
At the time of the transfer of the house, Barbara had approximately $40,000 in liquid assets, and, as noted above, her bills were paid through October. CT Page 9422
Relying on three provisions of the Connecticut General Statutes, the plaintiff has brought this action against Damian Fries on the ground of fraudulent conveyance. The first count, brought pursuant to section 52-552e(a)(1) of the General Statutes, alleges that the transfer of Barbara Hunter's one half interest in the property to Fries was fraudulent because the transfer was made with the intent to hinder, delay or defraud the plaintiff, a creditor. The second count alleges that the transfer was fraudulent pursuant to section 52-552e(a)(2) of the General Statutes, in that the transfer was made without receiving "reasonably equivalent value", and Barbara was either about to engage in a transaction for which her remaining assets were unreasonably small or she intended to incur, or should have known she would incur, debts beyond her ability to pay. The third count was brought pursuant to section 52-552f(a) of the General Statutes, because the transfer was made without receiving "reasonably equivalent value" and she either was insolvent at the time of the transfer or became insolvent shortly thereafter. The fourth count, alleging unfair trade practices, has been withdrawn. The fifth count seeks foreclosure to enforce the judgment, should the plaintiff prevail on one or more of the first three counts.[1]
The issues, as tried, are primarily factual.[2] In the circumstances presented, I find that the burden of proof has not been satisfied as to the first count, which requires a finding that the transfer was made with the specific intent to "hinder, delay or defraud" the plaintiff. There is, not surprisingly, no direct evidence of this element. The circumstances surrounding the transfer do not compel a finding of the requisite intent. The consideration for the transfer was not overly generous, but it was, as discussed below, not below a reasonable range. Barbara was left with assets to pay for services for a considerable period of time; indeed, it is at least possible that at the time of the transfer, the transaction had the effect of prolonging her ability to pay. Had she stopped paying bills earlier and had her half interest in the house still remained an asset, there is no guarantee that a forced sale, with its attendant expenses and, frequently, below market selling price, would have produced more liquid assets. The sale was straightforward; that is, there was no deviousness in the manner of the sale to suggest that the parties harbored an ill intent. In short, I do not find that the element of intent has been proven.[3]
CT Page 9423
The second and third counts include more objective elements. The second count alleges, as noted above, that Barbara did not receive "reasonably equivalent value" for the transaction and that she intended to incur, or should have known she would incur, debts beyond her ability to pay. Proof of the second element is somewhat troublesome, in that it is safe to say that in January, 1995, there probably was no way accurately to predict the total cost of Barbara's care, and at the time she had substantial, though by no means infinite, assets. The failure to satisfy the burden of proof as to "reasonably equivalent value" is dispositive of the count, however. I do not find that $50,000 was not reasonably equivalent value in the circumstances. There was credible testimony in this case that at the time of purchase, a great deal of work needed to be accomplished because of the run-down condition of the premises. In this context, it should be remembered that Fries is a contractor. The sale was accomplished immediately, without the need for commissions, inspections or financing. Had the house been available for attachment and sale by the plaintiff a year or more later, after bills were not paid, it may have been difficult to obtain the true value of the house, as the sale would have been "forced" and the house would have had more time in which to deteriorate. Barbara's available funds, in the meantime, may have been depleted somewhat by the expenses of carrying the real estate. These are factors which suggest that the purchase price was not unreasonable in the circumstances.[4]
This is a far cry from a situation in which little or nothing was received in return for the transfer.
The third count may be discussed more briefly. As this count also relies on the element of the lack of reasonably equivalent value, I find that the burden of proof has not been met
The fourth count of the complaint has been withdrawn. The fifth count, seeking foreclosure, need not be addressed: because judgment has been entered in favor of the defendant on counts one, two and three, there is no basis for foreclosure.
Judgment may enter in favor of the defendant.
Beach, J.